In re Peter C. COVINO, Jr. and
Florence L. Covino,
Debtors.

John H. Krommenhoek,
Trustee, Plaintiff,

v.

Peter C. Covino, Jr.; Florence L. Covino; Peter C. Covino, III; and Merlin Campbell, Sr., Defendants.

Bankruptcy No. 96–00756.
Adversary No. 98–6154.

United States Bankruptcy Court,
D. Idaho.

Sept. 1, 1999.

Jed W. Manwaring, Evans Keane, Boise, Idaho, for Plaintiff.

D. Bernard Zaleha, Boise, Idaho, for Peter C. Covino, Jr. and Florence Covino.

## MEMORANDUM OF DECISION AND ORDERS ON PENDING MOTIONS; FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

TERRY MYERS, Bankruptcy Judge.

John H. Krommenhoek ("Trustee") has sued chapter 7 Debtors Peter Covino, Jr. ("Peter") and Florence Covino ("Florence") seeking to revoke their discharge pursuant to § 727(d)(2) and (3). Trustee also sued Peter Covino, III ("Pete") the son of Peter and Florence. By consent of all parties, trial of the cause against Pete

1. Trustee also sued Merlin Campbell, receiving judgment by default against him.

2. The facts as found by the Court on the Trustee's causes of action are set forth more specifically below. This section of the decision sets out the procedural context and general background of the dispute.

3. Their initial attorney was Gordon Nielsen, who later passed away during the pendency of the bankruptcy case, prior to commencement of the instant adversary proceeding. They were thereafter represented for most of this litigation by Martin Martelle, who with-

was severed from the discharge revocation action and awaits a trial setting.[1]

The matter was tried over two days in March, 1999. Following trial, Peter and Florence moved (a) to allow written rebuttal statements to the oral closing argument of Trustee's counsel, and (b) to reopen the evidentiary record. The Trustee resisted the second of these motions, which was heard in May.

This decision and order disposes of the two pending defense motions. It also sets forth the Court's findings of fact and conclusions of law on the trial of the adversary proceeding. Rule 7052.

## I. BACKGROUND [2]

Peter and Florence filed their chapter 7 case on March 29, 1996. At that time they were represented by counsel.[3] On April 22, 1996, the § 341 meeting of creditors was held and Peter examined. He testified in regard to a paintball business [4] which, he advised the Trustee, had been terminated prior to filing bankruptcy.

On June 25, 1996 Peter and Florence received their discharge. Subsequent to the discharge, the Trustee became aware of certain property related to the paintball business which the Trustee concluded represented property of the Debtors' estate. Ultimately, in June 1998, the Trustee filed this adversary proceeding.

The Trustee claims that Peter and Florence should have their discharge revoked pursuant to § 727(d)(2) [5] because they ac-

drew in October, 1998. The Defendants appeared pro se for a period, until just before trial when Bernard Zaleha appeared on their behalf.

4. This is a venture where customers pay to wield air guns, loaded with ammunition consisting of small paint-filled balls, in a combat simulation environment.

5. Section 727(d) provides:

(d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge

quired property that was property of the estate (the paintball assets and some of the proceeds received from an uncompleted sale of those assets) and knowingly and fraudulently failed to report that acquisition or to deliver or surrender such property to the Trustee.

The Trustee further contends that Peter and Florence should have their discharge revoked pursuant to § 727(d)(3) because they committed an act specified in § 727(a)(6), *to wit*, failed to obey a lawful order of the Court. § 727(a)(6)(A). The violated order the Trustee contends, was a 1998 temporary restraining order prohibiting sale of the paintball assets.

■ The Trustee's cause of action is timely pursuant to § 727(e)(2) since the underlying chapter 7 case has yet to be closed. Under that provision, a discharge revocation action under § 727(d)(2) or (3) must be brought before the later of (a) one year after the granting of discharge and (b) the date the case is closed.[6]

This Court has jurisdiction over the matter. 28 U.S.C. §§ 1334(b), 157(a) and (b)(1). This is a core proceeding. 28 U.S.C. § 157(b)(2)(E), (J) and (O).

## II. APPLICABLE LAW

■ Under § 727(d)(2), a plaintiff must prove (1) that debtors acquired property of the bankruptcy estate and (2) they knowingly and fraudulently failed to report or deliver such property to the Trustee. *Bowman v. Belt Valley Bank (In re Bowman)*, 173 B.R. 922, 925–26 (9th Cir. BAP 1994), citing *In re Yonikus*, 974 F.2d 901 (7th Cir.1992). *Yonikus* held, in regard to the first element, that "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." 974 F.2d at 904.[7] In regard to the second element, it held that a finding of fraudulent intent may be based on inferences drawn from a course of conduct, or inferred from all the surrounding circumstances or the debtor's "whole pattern of conduct." 974 F.2d at 905, citing *In re Devers*, 759 F.2d 751, 753–54 (9th Cir.1985).

■ The Plaintiff bears the burden of proof, Rule 4005, and must establish all requisite elements of the cause of action by a standard of preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Bowman*, 173 B.R. at 924; *In re Lawler*, 141 B.R. 425, 429 (9th Cir. BAP 1992).[8]

granted under subsection (a) of this section if—

    (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;

    (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee; or

    (3) the debtor committed an act specified in subsection (a)(6) of this section.

6. An action for revocation of discharge based upon debtors obtaining their discharge through fraud, § 727(d)(1), must be brought within one year after discharge is granted. § 727(e)(1). The Trustee here is time-barred from proceeding under § 727(d)(1). While much of the evidence in this case might be viewed as relating to alleged fraud of the

Debtors, the relevance of that evidence must be limited, by virtue of § 727(e), to the Debtors' alleged "knowing and fraudulent" failure to disclose and surrender property of the estate. § 727(d)(2).

7. While § 727(d)(2) refers to property of the estate "acquired" by a debtor, this language includes pre-petition property interests concealed from a trustee. *Yonikus*, 974 F.2d at 903–04; *In re Barr*, 207 B.R. 168, 173–74 (Bankr.N.D.Ill.1997).

8. This Court in *In re Thie*, 97 I.B.C.R. 110, 111 (Bankr.D.Idaho 1997) stated: "A higher standard exists to obtain a revocation of a discharge than simply proving a section 727(a) cause of action and applying it to the fraud requirement in obtaining a discharge under section 727(d). An objecting party must show by *clear and convincing evidence* the debtor's intent to fraudulently obtain a discharge as opposed to committing an act of fraud against a creditor." (Emphasis added).

■ Actions seeking to revoke discharge are to be construed liberally in favor of the debtor and strictly against those objecting to discharge. *In re Adeeb,* 787 F.2d 1339, 1342 (9th Cir.1986); *Bowman,* 173 B.R. at 924; *McVay & Corrigan v. Barnetche,* 98.2 I.B.C.R. 37 (Bankr.D.Idaho 1998). Still, a bankruptcy discharge and fresh start are intended only for honest debtors. *Adeeb,* 787 F.2d at 1345; *Devers,* 759 F.2d at 754.[9]

■ That the subject conduct must be both "knowing" and "fraudulent" under § 727(d)(2), requires actual subjective intent, not "constructive" intent. However, circumstantial evidence and inference can establish such intent. *Devers,* 759 F.2d at 753–54. *See also, East Idaho Federal Credit Union v. Thomason,* 98.3 I.B.C.R. 77 (Bankr.D.Idaho 1998) (similar issue of intent under § 727(a) and in light of *Adeeb* ); *Barr,* 207 B.R. at 176 (pursuant to *Devers* and other precedent fraudulent intent may be "based on inferences drawn from a course of conduct" or "inferred from all of the surrounding circumstances);" *In re Aubrey,* 111 B.R. 268, 274 (9th Cir. BAP 1990) ("Fraudulent intent may be determined by circumstantial evidence.")

■ Once a prima facie case has been established, the Defendants must support the bona fides of the alleged transactions and their version of events. The Bankruptcy Appellate Panel in *Aubrey* adopted the analysis of the 7th Circuit in *First Federated Life Insurance Co. v. Martin (In re Martin),* 698 F.2d 883 (7th Cir. 1983). That court held: "It is clearly unsatisfactory to grant the debtor a discharge in a case such as this, where the debtor 'stonewalls' the creditor and refuses to credibly explain to the court his puzzling or suspect transactions." 698 F.2d at 888, cited at 111 B.R. at 273. In *Aubrey,* the debtor had failed to produce documentation of his alleged transactions, documentation that the Panel noted was much more likely to be in the possession and control of the defendant debtor than the plaintiff, who couldn't be expected to prove the negative (i.e., the nonexistence of the documents). *Id.* The Panel again quoted from *Martin:*

> The speculation of the bankruptcy judge or the creditors as to what may actually have been occurring is not an adequate substitute for a believable explanation by the debtor. The evidence in this case which could satisfactorily explain the events in question is far more likely to lie in the hands of a debtor than of the creditor.... To the extent that the debtor can explain these events he has an obligation to come forward and do so—he cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation.

*Id.,* citing 698 F.2d at 888.[10]

### III. DISPOSITION OF MOTION TO ALLOW WRITTEN REBUTTAL STATEMENT

Peter and Florence on March 18 moved the Court to allow them to submit a written rebuttal to a point made by the Trustee's counsel in his closing argument. No opposition to this motion was raised by the Trustee.

There is generally good and sound reason, once the parties have rested and closing arguments have been made, to refuse

This holding of *Thie* was reversed on appeal by the District Court in an unpublished decision dated August 5, 1999.

9. *Accord, In re Bernard,* 96 F.3d 1279, 1283 (9th Cir.1996) (denial of discharge, there under § 727(a)(2), is a harsh result, but bankruptcy has its roots in equity. To get equity one must do equity, and that was not achieved by a debtor's purposively narrow

reading of the term "transfer" under the Code.)

10. *Accord, In re Armstrong,* 931 F.2d 1233, 1239 (8th Cir.1991) (Under § 727(a)(2), if a gratuitous transfer is shown, the burden shifts to the debtor to prove that it was not made with improper intent.)

to allow additional argument. Virtually any competent attorney could fashion better articulated and more persuasive closing arguments, or remember to address something overlooked, with the benefit of hindsight and time to reflect. And rebuttals tend to beget surrebuttal. The process must at some point close.

Nevertheless, since no objection was raised by the Trustee, this motion will be granted.

## IV. DISPOSITION OF THE MOTION TO REOPEN THE RECORD

On April 23, Peter and Florence filed a "Motion to Re-open Record for Decision." They assert: "This motion is in the nature of a motion for new trial pursuant to Fed. R.Civ.P. 7059 based on newly discovered evidence."

The motion seeks to have the Court consider the declarations of Pete and of Steve Lampkins. Peter and Florence believe this will establish that (1) Pete, not Peter, sold the property that the Trustee believes was concealed property of the estate; (2) the sale was at a time when no restraining order was effectively in place; and (3) the equipment sold was not owned at that time by Peter.

The declaration of Pete asserts that the sale in question occurred on August 19, 1998 and that it was only after trial against Peter and Florence had concluded that he discussed the matter with his father, Peter, and became aware that the date of sale was in controversy. The declaration of Steve Lampkins also says that he purchased the property, from Pete, on August 19. Attached to both declarations is a document purporting to be an August 19,

1998 sale contract between Pete and Mr. Lampkins.

The motion is opposed by the Trustee who moves to strike the same and strike the two declarations. The Trustee also requests sanctions under Rule 9011. These matters were argued in May and also taken under advisement.

■ There is no "Fed.R.Bankr.P. 7059" as alleged by the Defendants. However, Fed.R.Civ.P. 59 is incorporated by Rule 9023. Rule 59(a) provides that the Court in a non-jury action may order a new trial for any of the reasons for which rehearings have traditionally been granted.[11] This would include "newly discovered evidence." A motion for new trial must be made not later than 10 days after entry of judgment, and be accompanied by affidavits simultaneously served. Rule 59(b), (c). The motion is here made before the entry of judgment.[12]

■ The Court reviews this motion under the standards generally applicable to Rule 59 requests made on the assertion of "newly discovered evidence."[13] There is a three-part analysis applicable to such motions: (1) the newly discovered evidence must have been discovered after judgment, and the movant must have been excusably ignorant of the facts at the time of trial despite due diligence to learn about the facts of the case; (2) the evidence discovered must be of a nature that would probably change the outcome of the case; and (3) the evidence must not be merely cumulative or impeaching. 12 Moore's Federal Practice (1998 3rd ed.) at § 59.13[2][d][ii]-[vii]. *See also, Jones v. Aero/Chem. Corp.*, 921 F.2d 875, 878 (9th Cir.1990) (similar test).

---

11. Rule 59(a) also states: "On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of new judgment."

12. While there is, thus, no possibility that the motion under Rule 59(b) is late, there is question of whether or not it is premature.

13. Counsel for Peter and Florence did not provide any authority in support of the motion, either through briefing or in response to the Court's inquiries at hearing.

In evaluating this motion, the Court finds that the first element is not satisfied. That the specifics of either Pete's or Mr. Lampkins' potential testimony might not have been known to Peter at trial is not the test. The question is whether or not that evidence was available to Peter and Florence through exercise of due diligence.

There was no surprise to the Defendants that questions concerning the details of the sale of the paintball assets in August 1998 were at issue, both in regard to the exact timing of the sale in relation to the Court's restraining orders and in regard to who allegedly owned and sold the property. The Trustee's Second and Third Amended Complaints put it at issue, and the Trustee further was clear in his view that the sale of the property violated existing orders as well as being inconsistent with the representations made by Peter in entering into an August 1998 stipulation with the Trustee. Peter even addressed, in a "chronology" he submitted with his pretrial statement, his son's sale during a "one day lapse" in the TRO's. Peter spoke directly to the timing issue in his motion to allow written rebuttal statement on March 18, a week after trial and more than a month before this "Rule 7059" motion.

That the Defendants would now like to more thoroughly vet this issue and present what they believe might be more compelling testimony or the alleged contract of sale does not make the evidence "newly discovered" or make the Defendants' alleged ignorance of the evidence "excusable" within the contemplation of the rule.[14]

The motion to reopen will therefore be denied.

14. The Court also sees problems regarding the second and third elements of the test described above but, as all three elements must be satisfied, these issues need not be addressed.

15. While Rule 9011(c)(1)(A) allows the Court to award fees and expenses to the opponent when a motion for sanctions is denied, such

## V. MOTION TO STRIKE AND FOR SANCTIONS

The Trustee moved to strike the motion to reopen, and seeks an award of sanctions. Trustee's counsel represented at hearing that the motion for sanctions was brought pursuant to the terms of Rule 9011.

Rule 9011(c) requires notice and a reasonable opportunity to respond to be afforded the party against whom such sanctions are sought. That rule also requires that a motion for sanctions be made separately from any other motion or request, and specifically describe the conduct alleged to violate Rule 9011(b). The Motion also may not be filed with or presented to the Court for a period of twenty-one days which provides the offending attorney an opportunity to remedy his conduct. Rule 9011(c)(1)(A).

The Court determines that the motion for sanctions is not in compliance with the Rule since it is coupled with the motion to strike and because the "safe harbor" provisions were not followed.

While the Court has found that the motion to reopen was without merit, and even though counsel for the defense acknowledged at hearing that he had not reviewed the authorities applicable to such motions, this is not enough to justify an award of sanctions to the Plaintiff in opposing the motion, since neither fact remedies the Trustee's failure to meet Rule 9011's requirements.

For the foregoing reasons, the Court determines that the motion for sanctions is not well taken and the same shall be denied.[15]

an award must be "warranted". The Court does not find that to be the case here, where the Defendants' underlying motion (which sought to reopen a closed evidentiary record without sufficient legal support) predictably generated the Plaintiff's objection and that objection was sustained.

## VI. FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND DISCUSSION

The Court makes the following findings of fact and conclusions of law, Rule 7052, upon the Trustee's causes of action under §§ 727(d)(2) and (d)(3), and addresses the contentions and arguments of the parties.

### A. Gotcha Challenge

Prior to December 1994, Peter and Florence ran a paintball business in Meridian, Idaho, allegedly through a closely-held Idaho corporation known as "Gotcha Challenge, Inc." (hereafter "Gotcha"). While there was evidence of the incorporation of Gotcha,[16] there was no proof that corporate formalities were followed or that the financial affairs of Gotcha were kept separate from those of Peter and Florence. There was no proof that the paintball assets were Gotcha's and not Peter and Florence's personal assets. The Court concludes from the entirety of the record that the paintball business assets were property of Peter and Florence as of December 1994.

### B. Peter and Florence (Gotcha) to Ammon

In December 1994, Peter determined that the paintball business would be closed. At the urging of his son, Ammon, he kept the business open and, in January 1995, allowed Ammon to assume management and control of that business. Business continued to be transacted under the "Gotcha Challenge" name. No sale or transfer of assets to Ammon occurred. Ammon took over day-to-day management.

While Ammon ran the business, Peter signed and filed with the Secretary of State the July 1995 annual report form which disclosed Peter as an officer and director for the corporation. Additionally, Ammon throughout 1995 signed checks on a "Gotcha Challenge, Inc." checking account.

Ammon's succession to management did not change the ownership of the assets of the paintball business.

### C. Ammon to Pete/Paintball Sports, Inc.

In November 1995, Ammon turned over the paintball business to his brother, Pete. There was again no actual conveyance of the assets or general assumption of liabilities,[17] and no documentation of any transfer. As with Ammon's assumption of control from his father, there was simply a change in management.

Pete testified to an intention of running the business through a new corporation to be formed for that purpose. In November 1995, Paintball Sports, Inc. was incorporated in the State of Idaho,[18] with Pete as the corporation's initial director, registered agent, and president. Pete commenced doing business[19] in November or December, 1995.

---

**16.** This proof was through the Secretary of State's certificate that Gotcha filed an "annual report" form on July 25, 1995. *See*, Plaintiff's Exhibit 19.

**17.** Rich Jarvis testified that he continued to collect from both the sons while they were "running" the business. In doing so, he had Pete sign a new "lease" agreement. *See*, Defendants' Exhibit K. But Jarvis also testified that he applied the payments to Peter's pre-existing obligation. That Jarvis saw fit to obtain additional assurance of payment notwithstanding the *seriatim* management changes does not legitimize any alleged conveyance of all assets and liabilities from Covino to Covino.

**18.** That this new corporation existed is based on Pete's testimony; Defendants' Exhibits B and C, apparently addressed to this point, were never offered. In fact, of the Defendants' marked Exhibits, only K, O and P were admitted.

**19.** Though Paintball Sports, Inc. was formed, and a corporate checking account used, there was no proof that financial separateness was maintained or corporate formalities followed. Paintball Sports' apparent separateness may have achieved the intended effect of reducing creditor demands on Paintball Sports for Peter's or Gotcha's debts, but it does not establish the fact of legal transfer of the assets, which remained, as through Ammon's tenure,

## D.  Bankruptcy disclosures

On March 29, 1996, Peter and Florence filed their voluntary petition for relief.  In their Statement of Affairs, in response to question No. 16, they disclosed that they were shareholders in an entity known as Gotcha Challenge, Inc., which existed "1991–1995."  The response to question No. 20 also reflected shareholder and officer status.  The Schedules did not disclose the stock in this corporation as an asset. Their response to question no. 8 of the Statement of Affairs asserted losses in the paintball business were suffered due to theft and vandalism in "1995."  The Statement of Affairs and Schedules reflected no ongoing interest of Peter or Florence in the paintball business.

In response to question no. 10 on the Statement of Affairs, Peter and Florence disclosed no transfers within the year prior to filing, *i.e.,* from March 26, 1995 to March 26, 1996.

Both Peter and Florence signed the Statement of Affairs.

## E.  Peter's first meeting testimony

On April 22, 1996 Peter was examined under § 343 at the meeting of creditors held under § 341.  Peter confirmed that Gotcha Challenge was a corporation involved in the "paintball" business.  Peter testified that the paintball guns and equipment "had been owned by somebody else. I was leasing it."  When the Trustee asked Peter if there were any assets of the business left, Peter responded: "No, the business went under and the person who owned the assets took possession of the assets."  (Transcript of First Meeting of Creditors, Plaintiff's Exhibit 2, page 3).

This first meeting dialogue clearly, but inaccurately, implied that a creditor acquired or seized the assets from Peter, that he closed the business, and that this

remained the case as of the date of the bankruptcy.

The Trustee also inquired as to whether debts listed in the schedules were business debts related to the paintball business to which Peter responded: "They're all from Gotcha, my paintball business.  I tried to make a go of something and it didn't go." He further testified that Gotcha incorporated in 1991 and "in August [1995], [I] just basically closed the door.  The sales tax people really closed me down." (Transcript, page 5).

This dialogue also leads inexorably to the conclusion that the business was closed when in fact, it remained open and was being operated by a family member.

The first meeting testimony and responses to questions on the Statement of Affairs also reflect an interest of Peter and Florence in the business "in 1995", which is inconsistent with Peter's trial testimony to the effect that he turned the business over to Ammon, at the latest, the first week or two of 1995.  The first meeting testimony also fails to disclose this assumption of operations by Ammon in January, 1995, or that the business was still open as of the date of the first meeting, following Pete's assumption of control from Ammon in November 1995.

On June 25, 1996 Peter and Florence received their discharge.

## F.  Closing, and Peter and Florence's renewed interest

In November, 1996, Pete decided to close the paintball business in order to focus on another business venture (Oasis Irrigation) which was operated out of the same physical facility as the paintball business, and in which Peter was working.  However, Pete was persuaded by Peter that the business should be sold as a going concern, rather than shuttered and liqui-

the property of Peter and Florence.  It is not inconsistent to find that Pete wished to use a new corporate identity to shield himself, while at the same time finding that Peter

failed to effectively transfer the property to Ammon, or that Ammon similarly failed to transfer it to Pete.

dated, and that the proceeds could be used to pay the debts Pete incurred as Paintball Sports, and also the paintball debts of Peter and Florence.

Pete agreed that Peter should attempt to sell the business. According to both, Peter was given no ownership interest in the assets, but was authorized for convenience to act as a "broker" and to make arrangements for sale in his (Peter's) own name rather than in Pete's name or that of Paintball Sports, Inc.

In November and December 1996, Peter signed checks by which a lease deposit and rent payments were made by "Paintball Sports." *See* Plaintiff's Exhibit 16.[20]

### G. Sale to Campbell, and repossession

On March 5, 1997 Peter and Florence executed a bill of sale, in their personal names,[21] conveying the paintball business assets to Merlin Campbell. The sales price was $24,000.00 which consisted of $10,000.00 down and an obligation to pay $1,000.00 a month for fourteen months on the balance. The bill of sale averred that Peter and Florence owned the property sold.[22]

On March 7, 1997 a UCC–1 financing statement was recorded with the Idaho Secretary of State listing Peter as a secured party and Campbell as a debtor. This statement was filed to protect a security interest granted to Peter by Campbell in the paintball assets.

The $10,000 was received by Peter from Campbell, and he used those funds primarily to pay obligations owed by Peter and Florence. Pete was not involved in deciding who got paid, and he did not receive any of these sales proceeds. Pete was, however, aware of the sale to Campbell.

Campbell defaulted on the payments to Peter and, on June 2, 1997 a state court complaint was generated on behalf of Peter and Florence on the contract. This action was apparently resolved by a default judgment, and a writ was issued on that judgment. In the state court litigation, Peter and Florence were consistently characterized as the owners of the property.

On February 10, 1998 the Trustee, having learned of the sale by Peter and Florence, made demand on Campbell for delivery of all of the amounts yet to be paid on the March 1997 sale contract. The Trustee put Peter and Florence on notice of this demand by copy of the letter.

Peter effected an Article 9 "repossession" of all the paintball business assets from Campbell on May 29, 1998. The writ upon which Peter allegedly relied indicated that Peter and Florence were the creditors entitled to such relief. A witness to the repossession testified that Peter indicated the assets were "his."

In June 1998 Peter served notice on Campbell concerning a pending Article 9 sale of the seized property. This notice also referred to only to Peter's rights as creditor.

### H. The TRO's

On June 26, 1998 the Trustee made an application for temporary restraining order (TRO) to prohibit liquidation of the assets. The same was granted by Judge Alfred C. Hagan of this Court, on June 29,

---

**20.** The Court reviewed the checks in this exhibit, and in Defendants' Exhibits O and P, and found in several instances dissimilar signatures for what purports to be the same individual.

**21.** Florence's signature on Plaintiff's Exhibit 4, the bill of sale, appears different from that on Plaintiff's Exhibit 1, the statement of affairs. *See also* n. 20, above.

**22.** Rich Jarvis notarized this bill of sale, even though he was aware that Pete claimed to be the owner. He stated that did not address these matters with Mr. Campbell. He also received a sizeable portion of the Campbell sale proceeds from Peter.

1998 at a hearing where Peter and Campbell were present.

On July 2, this first TRO was entered and Peter and Florence enjoined for a period of 14 days. Before expiration of that period, on July 10, 1998, the Trustee moved for a preliminary injunction. That motion was heard on July 14 at which time attorney Martin Martelle appeared on behalf of Peter and Florence, and Judge Hagan granted the Trustee's request.

An Amended TRO, was entered July 15 based upon the July 14 hearing. By its terms, it would expire 20 days after Peter's deposition was taken by the Trustee. That deposition was taken on July 29, 1998. This TRO would therefore expire August 18, 1998.

On August 20, 1998 the Trustee renewed his motion for preliminary injunction. This motion was based in part upon the deposition of Peter which indicated that the property was held by Pete and a sale was possible absent an injunction.[23] It was also based on the fact that, while a stipulation as to sale and preservation of the proceeds had been discussed, Peter hadn't entered into that stipulation.

A formal stipulation executed by Peter, his lawyer Mr. Martelle, and the Trustee's counsel was filed on August 24, 1998. As a result, and contemporaneously with its filing, the Trustee withdrew the August 20 request for renewed injunctive relief.

Peter had executed this stipulation on August 5 and Mr. Martelle signed it on August 17. Both thus executed it before the effective termination date of the pending TRO, but it apparently required the Trustee's August 20 motion in order to bring the agreement forward. As noted above, Peter takes the position that sale occurred on August 19, during the "lapse" between the TRO's expiration and the renewed motion.

This agreement of the parties, based upon which Plaintiff withdrew his injunctive pleadings, provided that Peter and Florence could sell the paintball assets on the condition that all proceeds would be held by the Trustee pending the outcome of the instant litigation. At approximately the same time as this stipulation was made, the paintball assets were being sold to Mr. Lampkins.[24]

## I. The discharge revocation issues

The Trustee's causes of action are twofold. First, he asserts that the paintball assets belonged to Peter and Florence and constituted property of the estate knowingly and fraudulently concealed. Second, the Trustee asserts that Peter and Florence violated the last of Judge Hagan's TRO's—the one existing through August 18 and replaced by the stipulation—by selling the property while restrained. There are no other relevant causes of action in this discharge revocation proceeding.[25]

### 1. Section 727(d)(2)

The Trustee, in closing argument, recognized that there was no "smoking gun" but asserted that there were several "badges of fraud" (such as transfers among family members, which were undisclosed, undocumented and for no or inadequate consideration)[26], as well as inconsistencies in the

---

**23.** See the published July 29 Deposition of Peter Covino, Jr., at p. 34–37. This information also appears to have led to the filing of the Second Amended Complaint on August 3, 1998 which named Pete as a Defendant.

**24.** The Covinos testified that Pete sold to Lampkins. An employee at the business, Jeff Caudillo, testified that Lampkins bought from Peter. Lampkins did not testify. The Lampkins' sale later fell through, allegedly as a result of the Trustee's actions. While the

assets, or most of them, apparently still exist, Peter alleges that they are now worth little.

**25.** See discussion, infra, at part VI—K.

**26.** The Court in In re Stanke, 234 B.R. 449, 457 (Bankr.W.D.Mo.1999) set forth eleven factors which have been judicially considered in determining fraudulent intent, including lack or inadequacy of consideration; family or similar close relationships between trans-

evidence which impeached the Defendant's case, and a wealth of other circumstantial evidence, all of which required a finding of fraudulent intent.

The Trustee is entitled to attempt to establish his case upon circumstantial evidence, including inferences from the course or pattern of conduct and surrounding circumstances. *See,* discussion at part II, *supra.* The Court has kept in mind—as it must—the burden of proof established by law, as well as the accepted principles of construction applicable to discharge revocation litigation. The Court has concluded that, upon the entirety of the evidence, the Trustee has met his burden.

The two primary critical facts that the Trustee must prove are that the paintball equipment and assets were property of the estate on March 29, 1996, the date the petition was filed, and that Peter and Florence "knowingly and fraudulently" failed to disclose or surrender the property. If Peter and Florence's ownership as of March 1996 is not established, the later evidence of their ownership, such as in the sale to Campbell in 1998, though suspicious and certainly sufficient to justify the Trustee's aggressive pursuit, is not actionable.

Conversely, successful defense of this adversary requires that the Court find that the evidence establishes several propositions, the two most critical being that Peter and Florence transferred all interest in this property before bankruptcy to Ammon and retained no interest at filing that would be property of the estate,[27] and that, when Peter and Florence again appeared as the owners of the property when they sold it post-bankruptcy to Campbell, they were acting only as agents for Pete or for Paintball Sports in the liquidation of the property.

### a. Property of the estate

While Peter at trial testified that Ammon "got" the business in December 1994 or the very first part of January 1995, the evidence shows only a change in management. There was nothing to document or prove a legitimate transfer of any sort occurred. Though Peter testified that there was no "sale" to Ammon (so that none need be documented), he necessarily contends that the successive assumptions of operations by his sons means the assets were no longer his and Florence's at the time of the bankruptcy filing.

Gotcha was still a corporation in 1995 as reflected by Plaintiff's Exhibit 19, the July 1995 annual report filing that Peter executed as officer and director. This public filing occurred after the transfer to Ammon which Peter testified about at trial, and notwithstanding the shutdown he testified to at the first meeting. The Statement of Affairs' disclosure of losses "in 1995" also contradicts the assertion of Ammon's ownership starting in 1994.

The bankruptcy was filed on March 29, 1996. Before that date, Ammon had, in turn, conveyed the business to Pete. When Ammon turned the business over to Pete in the fall of 1995, it was in much the same, informal manner as he had received it from his father. There was no documentation or proof of any sale or transfer. While Pete did form a corporation for the purpose of running the business, and professed a desire to observe corporate formalities, nothing corroborates that this new corporation owned the assets.[28]

feror and transferee; retention by the transferor of possession, use or benefit of the property; secrecy of the conveyance; the pattern of transactions and course of conduct, including conduct after pendency or threat of suit. The court noted that any one factor may be sufficient basis for a finding of intent, and the presence of more than one strongly indicates such intent.

27. Ammon's transfer to Pete is not effective to "wash" the assets if the transfer to Ammon was insufficient to vest Ammon with the rights to that property.

28. Peter, in his pretrial statement, asserted that the fact that Paintball Sports, Inc. was incorporated in 1995 "clearly shows who owned" the business assets at bankruptcy. This assertion is far from "clear" or self-

Both the transfers—Peter to Ammon, and Ammon to Pete—were without proven consideration, were not documented, and were not proven to have altered the ownership existing prior to December 1994.[29]

The Court finds and concludes that the paintball assets were property of the estate on the date of Peter and Florence's petition for relief. Thus, the Campbell sale proceeds obtained by Peter and Florence in 1997, and the repossessed property in 1998, are also property of the estate, § 541(a)(6), and were not surrendered to the Trustee.

### b. Knowingly and fraudulently concealed.

■ The Court evaluates the issue of intent in light of the totality of the evidence, direct and circumstantial. Critical to that evaluation is whether the defense explanations are logical and consistent with the facts, and whether the testimony, here particularly Peter's, is credible.

■ To all appearances, Peter is an intelligent and articulate businessman. Yet the Defendants' approach to this case requires the Court to conclude that his business acumen, at certain times though not necessarily at others, is set aside or lost; that he was unaware of the need for documenting asset transfers or other aspects of his financial affairs; that he simply forgot to explain to the Trustee at the first meeting the transfer to Ammon, and did not intend to mislead the Trustee as to whether the business was open or closed, or who was running it; that his later assertions of ownership in 1998 were solely in the role of an undisclosed broker for Pete. The Court is asked to subscribe to a

view that there is a series of "innocent explanations" for what otherwise appears to be an intentional concealment of the true facts concerning this business, and Peter and Florence's rights to it.

As held above, Peter's *post hoc* explanation of the prebankruptcy "transfers" is insufficient to create a valid divesting of his and Florence's ownership of the property of the estate. The belief that running a business is the legal equivalent of owning that business, even if sincerely held, is not enough to create a legally cognizable transfer of ownership. And the alleged sincerity of this belief is questionable on the entirety of the record.

While concededly terse (and a far cry from his effusive ·testimony at trial), Peter's first meeting testimony appears designed to convince the Trustee that no paintball business or assets existed at all. That testimony concealed the existence and true ownership of the property. The conclusions naturally drawn from that testimony would lead the Trustee away from the paintball business, and discovery or further investigation of facts related to it. Misleading and evasive testimony at the first meeting impeaches the later testimony. So, too, does the lack of credible and corroborative documentation. In total, these circumstances support the "knowing and fraudulent" nature of the concealment.

The Court further finds that the contention that Peter was a "broker" authorized to pursue sale of the business assets in his and Florence's name but for Pete's benefit an unlikely, and ultimately ·incredible, explanation.[30] Even if Peter prevailed upon

evident, and was never proven. The mere fact of incorporation is not conclusive.

**29.** Corroborative documentation is notably lacking. *See, Aubrey,* 111 B.R. at 273, discussed above. Instead, the defense paraded a series of witnesses to the stand, most of whom were employees of the business and competent to testify only as to which of the Covinos they most regularly saw at the business at various times; none were shown competent

to testify as to the ownership of the business, and their testimony was not probative.

**30.** Interestingly, Peter argues that two transfers, first to Ammon and thence to Pete, are effective transfers of ownership though undocumented, but that the third transfer, from Pete to Peter, despite contrary documentation reflecting that Peter and Florence were the owners, was neither accurate nor effective because it was done solely to "broker" the sale of the property.

Pete to try to realize something from the business, there was no reason to engage in the fiction of Peter and Florence's ownership without disclosure of the "true" owner. The sons worked at the same physical location as their father. Obtaining Pete's signature would not, from the evidence, be particularly difficult. Nothing prohibited a disclosed agency for Peter to assist Pete. Under the circumstances, that Peter and Florence reappeared in 1997 as the owners of the property at the time of sale to Campbell is as consistent with concealment of the property of the estate until well after their June 1996 discharge as it is with the explanation of acting as an undisclosed "broker" for Pete in liquidating a twice informally transferred business.[31]

The Court concludes that both elements of the Trustee's first cause of action under § 727(d)(2) have been established by a preponderance of the evidence.

### 2. Section 727(d)(3)

The key to the second cause of action under § 727(d)(3) is whether Peter and Florence failed to obey an order of the Court. The only order at issue, and the order the Trustee relies upon, is the amended TRO entered on July 15, which expired on August 18, and which was supplanted by the August stipulation. The Court concludes that the Trustee has failed to establish a violation of Court order as a prerequisite to revocation of discharge under § 727(d)(3) and (a)(6). There is inadequate evidence of a sale occurring during the effective term of this TRO.

Still, Peter's approach to the TRO and the stipulation[32] was duplicitous. The stipulation between the Trustee and Peter recites in pertinent part "Defendant [Peter] may sell of [sic] the inventory and equipment which is subject to the temporary restraining order now in effect on the condition that all proceeds from the sale will be forwarded to the Trustee to be placed in the trust account pending resolution of this litigation."

Peter signed the same knowing that the assets existed and were held by Pete, and that he was only agreeing that he (Peter) would not sell the assets, though he knew his son could or would. The expressed intention of this stipulation in August 1998 was to preserve the status quo *pendente lite*. Peter takes a highly legalistic view, noting that Pete was not a signatory and therefore not bound, regardless of Peter's own agreement and understanding. Peter knew at the time that his and Florence's interests in the property were in dispute, and knew that there was no ruling yet entered that established the property was Pete's alone. He also knew that, absent agreement, the Trustee would continue seeking injunctive relief, as indeed occurred with the August 20 motion. He indicated an intent to agree well before the TRO's expiration, but the actual stipulation was not filed until after the Trustee had on August 20 sought an injunction to replace the one that had lapsed on August 18. The chronology appears to reflect a design to create the lapse in TRO's and insulate a sale "by Pete."

Under all the circumstances, the argument that sale was proper because it was during a lapse period between TRO's, or done by Pete not Peter, is more than merely sharp tactics. The stipulation Peter signed had as its apparent and proper goal the preservation of the status quo until the claims and defenses could be adjudicated. Peter knew that the agreement would replace the extant TRO. The circumstances reflect an intent to mislead the Trustee as to his intentions, and evade the reach of the earlier injunction. Peter's conduct was consistent with an ongoing

**31.** Additionally inconsistent with the "brokerage" are the facts that the funds from Campbell were used by Peter to pay his own debts, that Pete was not consulted or involved in that process, and that neither Pete or Paintball Sports received the money from the sale of "their" assets or directed their "agent" as to how the funds were to be applied before they were expended.

**32.** The stipulation was not signed by Florence, nor Pete.

attempt to keep the Trustee from the property of the estate.

The Court concludes that, while a violation of the TRO was not established for § 727(d)(3) purposes, the conduct lends additional support to the intent element under § 727(d)(2).

### K. Other discharge issues

■■■■ A debtor's discharge may be lost if he transfers or conceals property of the estate after filing, § 727(a)(2); destroys, conceals, or fails to keep adequate records from which his financial affairs can be ascertained, § 727(a)(3); or makes a false oath or gives false testimony, § 727(a)(4). Additionally, a discharge may be revoked if obtained through fraud. § 727(d)(1). Much of the conduct addressed in the foregoing discussion and in the Court's findings and conclusions could be viewed as relevant to these types of actions.

■■■ However, the Court specifically notes that it is not allowed at this time to evaluate any of these legal issues, since the provisions of § 727(a) must be raised prior to discharge, Rule 4004(a), and revocation of discharge for fraud must be asserted within one year of the entry of discharge. § 727(d)(1), (e)(1).

The Debtors' conduct, rather, has only been considered here to the extent relevant to and probative of whether or not the property of the estate existed and was knowingly and fraudulently concealed under § 727(d)(2).

### L. Revocation of Florence's discharge

■■■ Prior to trial, the Defendants moved to dismiss the action as against Florence, on the theory that there was no evidence of her improper conduct. Since the case had yet to be heard, the motion was premature, and it was denied. Similar relief was requested at the end of the Plaintiff's case, and ruling was reserved

until after the evidence was in and evaluated. The Court now concludes that Florence's discharge, like Peter's, should be revoked, and the motion to dismiss the complaint against her will be denied.

In *Arm v. A. Lindsay Morrison, M.D., Inc. (In re Arm)*, 87 F.3d 1046 (9th Cir. 1996), the Court held:

> We make clear, what we have not held before, that the indirect benefit to a debtor from a fraud in which he participates is sufficient to prevent the debtor from receiving the benefits that bankruptcy law accords the honest person. *See In re Ashley*, 903 F.2d 599, 604 n. 4 (9th Cir.1990)

87 F.3d at 1049.

Florence signed the Statement of Affairs and Schedules and was obligated to know the truth of those assertions. While she was not at the first meeting, *see* Plaintiff's Exhibit 2 at p. 1, her husband was testifying on behalf of both debtors. Even if she did not learn of this testimony until the March 1999 trial, when the tape and transcript were introduced as Plaintiff's exhibits, she knew of Peter's testimony in time to disavow any inaccuracy or error.[33] She did not. And she either became involved with knowledge, or let herself be used, when the property was sold post-petition to Campbell.

Once the Trustee presented a prima facie case, it was up to Florence to present evidence or explanation to show that she lacked knowledge of the improper conduct, to explain away the contrary indications from the evidence, and to show an absence of "knowing and fraudulent" intent. She did not do so. Florence did not testify as to her awareness, if any, about what Peter was doing. The Court was not provided an opportunity to gauge her credibility or lack thereof, or evaluate the extent of her knowledge of these various events.

For these reasons and on this record, therefore, her discharge shall also be revoked.

---

**33.** In fact, a transcript of the first meeting testimony was filed in the Debtors' chapter 7 case on November 2, 1998, and the certificate of service indicates a copy was mailed to Peter and Florence.

**M.  Trustee's request for money judg-
ment**

The Trustee's complaint seeks, in addition to revocation of discharge, a money judgment against Peter and Florence for the $10,000 initial payment received from Campbell, $2,000 for two monthly payments allegedly made by Campbell, and an amount representing the "value" of the assets to the extent they still exist.

This relief is adequately supported by the evidence to the extent of the $10,000 which was received and utilized by and to the benefit of Peter and Florence, and judgment will be entered for $10,000.00. The Court finds that the evidence is inadequate to support award of other sums, or to ascribe a specific value to the missing property of the estate. However, the evidence does support entry of judgment requiring Peter and Florence to turn over to the Trustee any of the paintball assets still within their personal possession or control. The Judgment may also reflect that any unpaid balance of the Campbell receivable is property of the estate.