**In re Peter C. COVINO, Jr., and Florence L. Covino, Debtors.**

Bankruptcy No. 99–02699.

United States Bankruptcy Court, D. Idaho.

Feb. 10, 2000.

See also 241 B.R. 673.

D. Bernard Zaleha, Boise, Idaho, for debtors.

Jed W. Manwaring, Evans, Keane, Boise, Idaho, for John Krommenhoek.

Bernie Rakozy, Boise, Idaho, Chapter 13 Trustee.

## MEMORANDUM OF DECISION RE TRUSTEE' MOTION TO DISMISS

JIM D. PAPPAS, Chief Judge.

### Background

Trustee Bernie Rakozy ("Trustee") moves the Court to dismiss this Chapter 13 case. He accuses Debtors Peter and Florence Covino ("Debtors") of foul play in dealing with the claims of their creditors, including those asserted by a trustee from a prior bankruptcy case. Debtors insist they are attempting a legitimate, lawful reorganization of their finances. Trustee's motion came on for hearing before this Court on January 4, 2000, after which the matter was taken under advisement. What follows are the Court's findings of fact and conclusions of law. Fed.R.Bankr. Proc. 7052.[1]

### Facts

Debtors began their journey through this District's bankruptcy court on March 29, 1996, when they filed a petition under Chapter 7. Debtors were granted a discharge on June 25, 1996. However, on June 18, 1998, John Krommenhoek, the Chapter 7 trustee, filed an adversary complaint seeking recovery of certain assets and a money judgment against Debtors, together with a revocation of discharge as provided under Sections 727(d) of the Bankruptcy Code.[2] The complaint alleged, in substance, that Debtors had ignored their duties under the Code to cooperate with the trustee in the administration of their bankruptcy case, and violated their obligation to fully disclose relevant details concerning their financial affairs in seeking bankruptcy relief. It seems Mr. Krommenhoek had become aware of the existence of certain assets not disclosed by Debtors in the bankruptcy case, and that Debtors had allegedly sold other property without notice to or the involvement of the trustee. Mr. Krommenhoek believed Debtors fraudulently concealed those assets and the sale from the trustee, creditors, and the Court in their Chapter 7 case. Because they had not been truthful and honest in connection with that case, Mr. Krommenhoek alleged Debtors should not receive the principal benefit of a bankruptcy case, a discharge of indebtedness.

In March, 1999, the parties appeared with their attorneys before Judge Myers, who conducted a trial in the adversary proceeding. After carefully considering the evidence, testimony, and the arguments of the parties, on September 1, 1999, the Court issued a lengthy Memorandum of Decision detailing its findings of fact, conclusions of law, and order.[3] The following facts recited by the Court in its decision disposing of the adversary proceeding add to the context of the present case:

> Prior to December 1994, Peter and Florence ran a paintball business in Meridian, Idaho, allegedly through a closely-held Idaho corporation known as "Gotcha Challenge, Inc." (hereafter "Got-

---

1. The Court also heard arguments concerning confirmation of Debtors' proposed Chapter 13 plan at this hearing. In light of this decision, those issues are moot.

2. Mr. Krommenhoek requested that Debtors' discharge be set aside under two different statutory provisions, 11 U.S.C. § 727(d)(2) and (3). Subsection (2) allows revocation of discharge where a debtor

 acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to

such property, or to deliver or surrender such property to the trustee;

 11 U.S.C. § 727(d)(3) allows revocation of discharge where the debtor commits an act prescribed by 11 U.S.C. § 727(a)(6).

3. *Krommenhoek v. Covino (In re Covino),* 99.4 I.B.C.R. 138, 241 B.R. 673 (Bankr.D.Idaho 1999). At the hearing on Trustee's Motion to Dismiss, Debtors and Trustee agreed this Court could consider the Memorandum of Decision as part of the record in this proceeding.

cha"). While there was evidence of the incorporation of Gotcha, there was no proof that corporate formalities were followed or that the financial affairs of Gotcha were kept separate from those of Peter and Florence. There was no proof that the paintball assets were Gotcha's and not Peter and Florence's personal assets. The Court concludes from the entirety of the record that the paintball business assets were property of Peter and Florence as of December 1994.

\* \* \* \* \* \*

In December 1994, Peter determined that the paintball business would be closed. At the urging of his son, Ammon, he kept the business open and, in January 1995, allowed Ammon to assume management and control of that business. Business continued to be transacted under the "Gotcha Challenge" name. No sale or transfer of assets to Ammon occurred. Ammon took over day-to-day management. While Ammon ran the business, Peter signed and filed with the Secretary of State the July 1995 annual report form which disclosed Peter as an officer and director for the corporation. Additionally, Ammon throughout 1995 signed checks on a "Gotcha Challenge, Inc." checking account. Ammon's succession to management did not change the ownership of the assets of the paintball business.

\* \* \* \* \* \*

In November 1995, Ammon turned over the paintball business to his brother, Pete. There was again no actual conveyance of the assets or general assumption of liabilities, and no documentation of any transfer. As with Ammon's assumption of control from his father, there was simply a change in management. Pete testified to an intention of running the business through a new corporation to be formed for that purpose. In November 1995, Paintball Sports, Inc. was incorporated in the State of Idaho, with Pete as the corporation's initial director, registered agent, and president. Pete commenced doing business in November or December, 1995.

\* \* \* \* \* \*

On March 29, 1996, Peter and Florence filed their voluntary petition for relief. In their Statement of Affairs, in response to question No. 16, they disclosed that they were shareholders in an entity known as Gotcha Challenge, Inc., which existed "1991–1995." The response to question no. 20 also reflected shareholder and officer status. The Schedules did not disclose the stock in this corporation as an asset. Their response to question no. 8 of the Statement of Affairs asserted losses in the paintball business were suffered due to theft and vandalism in "1995." The Statement of Affairs and Schedules reflected no ongoing interest of Peter or Florence in the paintball business. In response to question no. 10 on the Statement of Affairs, Peter and Florence disclosed no transfers within the year prior to filing, i.e., from March 26, 1995 to March 26, 1996. Both Peter and Florence signed the Statement of Affairs.

\* \* \* \* \* \*

On April 22, 1996 Peter was examined under [Section] 343 at the meeting of creditors held under [Section] 341. Peter confirmed that Gotcha Challenge was a corporation involved in the "paintball" business. Peter testified that the paintball guns and equipment "had been owned by somebody else. I was leasing it." When the Trustee asked Peter if there were any assets of the business left, Peter responded: "No, the business went under and the person who owned the assets took possession of the assets." This first meeting dialogue clearly, but inaccurately, implied that a creditor acquired or seized the assets from Peter, that he closed the business, and that this remained the case as of the date of the bankruptcy. The Trustee also inquired

as to whether debts listed in the schedules were business debts related to the paintball business to which Peter responded: "They're all from Gotcha, my paintball business. I tried to make a go of something and it didn't go." He further testified that Gotcha incorporated in 1991 and "in August [1995], [I] just basically closed the door. The sales tax people really closed me down."

This dialogue also leads inexorably to the conclusion that the business was closed when in fact, it remained open and was being operated by a family member.

The first meeting testimony and responses to questions on the Statement of Affairs also reflect an interest of Peter and Florence in the business "in 1995", which is inconsistent with Peter's trial testimony to the effect that he turned the business over to Ammon, at the latest, the first week or two of 1995. The first meeting testimony also fails to disclose this assumption of operations by Ammon in January, 1995, or that the business was still open as of the date of the first meeting, following Pete's assumption of control from Ammon in November 1995. On June 25, 1996 Peter and Florence received their discharge.

\* \* \* \* \* \*

On March 5, 1997 Peter and Florence executed a bill of sale, in their personal names, conveying the paintball business assets to Merlin Campbell. The sales price was $24,000.00 which consisted of $10,000.00 down and an obligation to pay $1,000.00 a month for fourteen months on the balance. The bill of sale averred that Peter and Florence owned the property sold.

On March 7, 1997 a UCC–1 financing statement was recorded with the Idaho Secretary of State listing Peter as a secured party and Campbell as a debtor.

This statement was filed to protect a security interest granted to Peter by Campbell in the paintball assets. The $10,000 was received by Peter from Campbell, and he used those funds primarily to pay obligations owed by Peter and Florence. Pete was not involved in deciding who got paid, and he did not receive any of these sales proceeds. Pete was, however, aware of the sale to Campbell.

Campbell defaulted on the payments to Peter and, on June 2, 1997 a state court complaint was generated on behalf of Peter and Florence on the contract. This action was apparently resolved by a default judgment, and a writ was issued on that judgment. In the state court litigation, Peter and Florence were consistently characterized as the owners of the property.

On February 10, 1998 the Trustee, having learned of the sale by Peter and Florence, made demand on Campbell for delivery of all of the amounts yet to be paid on the March 1997 sale contract. The Trustee put Peter and Florence on notice of this demand by copy of the letter.

Peter effected an Article 9 "repossession" of all the paintball business assets from Campbell on May 29, 1998. The writ upon which Peter allegedly relied indicated that Peter and Florence were the creditors entitled to such relief. A witness to the repossession testified that Peter indicated the assets were "his."

*Covino,* 99.4 I.B.C.R. at 141–43, 241 B.R. at 681–83 (citations and footnotes omitted).[4]

In light of these facts, the Court concluded that the paintball assets were property of Debtors' bankruptcy estate on the date they filed for Chapter 7 relief, *Covino,* 99.4 I.B.C.R. at 141, 241 B.R. at 686; that Debtors knowingly and fraudulently

4. While Peter Covino was the principal bad actor in the Chapter 7 case, the Court found that Florence Covino "became involved, or let herself be used ..." in the perpetration of the fraudulent schemes. *Covino,* 99.4 I.B.C.R. at 145, 241 B.R. at 688. Therefore, the judgment entered by the Court runs against both Debtors.

concealed the existence and true ownership of these assets from the Chapter 7 trustee, *Id.*, 241 B.R. at 686–87; and that Debtors' discharge should be revoked. *Id.*[5] The Court also awarded Mr. Krommenhoek, on behalf of the Chapter 7 bankruptcy estate, a money judgment of $10,000 against Debtors, representing the value of various assets withheld from the trustee for liquidation for creditors, and also ordered Debtors to turn over other assets belonging to the bankruptcy estate. *Id.* at 145–46, 241 B.R. at 689.

Debtors took no appeal from the Memorandum of Decision and resulting judgment entered in favor of Mr. Krommenhoek on September 16, 1999. In addition, Mr. Krommenhoek reports that Debtors made no payments on the money judgment, nor did they comply with the Court's order requiring surrender of assets to Mr. Krommenhoek for liquidation. Instead, when Mr. Krommenhoek sought to enforce the judgment, on October 15, 1999, Debtors filed a second bankruptcy petition, this time seeking safe harbor under Chapter 13 of the Bankruptcy Code.[6] On the same day, Debtors filed their proposed Chapter 13 plan.

A review of the information contained in the second bankruptcy case file is enlightening. Debtors' schedules indicate Mr. Covino is employed as a salesman earning approximately $3,000 per month. Mrs. Covino is evidently not employed. Without explanation, Debtors list two adult children as dependents. Their budgeted monthly expenses are unremarkable. Debtors' assets include their home, an older used car, and various household goods. Debtors schedule just over $100,000 in unsecured debts, all of which appear to have been incurred prior to their Chapter

7 filing, except of course the $10,000 money judgment against them in favor of Mr. Krommenhoek.[7]

Debtors' plan should hardly be encouraging to their creditors. Debtors propose to pay $75 per month, plus an unspecified amount of income tax refunds, for 36 months to the Chapter 13 Trustee for distribution to their creditors. Of that amount, $699 will be paid to their attorney, and at least $270 will be consumed in administrative fees. Debtors' plan proposes no payments to secured creditors, either directly or through the Trustee, nor do they propose to surrender any collateral to secured creditors. However, Debtors' schedules reflect they own a home on which there is an outstanding mortgage, and their monthly expenditures include a mortgage payment of about $1,300. The Court therefore presumes this debt will be paid directly by Debtors according to its terms. In summary, other than the unspecified tax refunds, it would appear that over the next three years, Debtors will pay less than $1,800, pro-rata, to their unsecured creditors. No specific mention is made in the plan of Debtors' obligation to deliver assets to Mr. Krommenhoek.

Trustee filed the Motion to Dismiss the Chapter 13 case on November 5, 1999. Mr. Krommenhoek joins him in seeking dismissal.

**Discussion**

There should be no confusion why Debtors are back in bankruptcy. They freely admit they were motivated to file the Chapter 13 petition primarily as a means of avoiding the effects of the judgment entered against them in the Chapter 7 case revoking their discharge and awarding Mr. Krommenhoek a money judgment

---

**5.** The Court concluded that Mr. Krommenhoek had not proved a case for revocation of Debtors' discharge for violation of a Court order under Section 727(d)(3).

**6.** Debtors' Chapter 7 case remains pending, and Mr. Krommenhoek's money judgment against Debtors remains unsatisfied.

**7.** To be accurate, many of the scheduled debts do not include the required information as to when they were incurred. Debtors' attorney conceded at the motion hearing that his clients' debts were, in essence, the same as those they were seeking to discharge in their Chapter 7 case.

against them. Other than to obtain the benefits of the "super-discharge" granted to debtors successfully completing performance of a confirmed Chapter 13 plan under 11 U.S.C. § 1328(a), bankruptcy would offer Debtors no effective relief.

■ Based upon all the circumstances, and especially the fact that Debtors' Chapter 7 case is still pending, Trustee argues Debtors filed their Chapter 13 petition in bad faith, justifying dismissal under Section 1307 of the Bankruptcy Code. That statute provides for dismissal of a case for "cause," and enumerates ten non-exclusive examples constituting good cause. 11 U.S.C. § 1307(c)(1)–(10). "Although not specifically listed, bad faith is a 'cause' for dismissal under § 1307(c)." *In re Leavitt,* 171 F.3d 1219, 1224 (9th Cir.1999). Trustee asserts Debtors' Chapter 13 case, commenced while their Chapter 7 case is still pending, is intended solely as an obstacle to the Chapter 7 trustee's efforts to collect the assets and finish out the prior bankruptcy case, and an attempt by Debtors to circumvent the Court's order revoking their bankruptcy discharge.

As mentioned, Debtors do not attempt to deny this allegation. In response, Debtors remind the Trustee and Court there is no express, statutory bar to asking for a "second bite at the apple" as they have, and so, Debtors maintain, the Court should not turn them away.

■ Courts, including this one, have generally agreed with Debtors' assertion that there is no absolute prohibition against the filing of a Chapter 13 petition while another bankruptcy case remains pending. *See Grimes v. Farmers Home Administration (In re Grimes),* 117 B.R. 531, 535 (9th Cir. BAP 1990); *In re Whitmore,* 98.3 I.B.C.R. 82, 83, 225 B.R. 199, 202 (Bankr.D.Idaho 1998); *In re Ross,* 95 I.B.C.R. 111, 112 (Bankr.D.Idaho 1995). *But see, In re Pickering,* 195 B.R. 759, 766 (Bankr.D.Mont.1996) (a second bankruptcy petition cannot be filed while a previous bankruptcy petition is still pending). Fil-

ing a second case before the first is concluded, while perhaps evidence of bad faith, is not so *per se. Downey Savings and Loan Association v. Metz (In re Metz),* 820 F.2d 1495, 1497 (9th Cir.1987). However, as *Metz* and *Whitmore* instruct, the Court need not ignore, and should certainly be alert to, the results achieved by both filings in determining whether the debtors have acted in bad faith. *Metz,* 820 F.2d at 1497; *Whitmore,* 98.3 I.B.C.R. at 83, 225 B.R. at 202.

■ In deciding whether to dismiss a Chapter 13 case for bad faith, the Court applies a "totality of the circumstances" test. *In re Leavitt,* 171 F.3d 1219, 1224 (9th Cir.1999); *Eisen v. Curry (In re Eisen),* 14 F.3d 469, 470 (9th Cir.1994). In some extreme circumstances, where bad faith is found, more than "mere" dismissal is appropriate. As the Court in *Leavitt* explains:

Generally, dismissals are ordered without prejudice to carry out the remedial purpose of the Bankruptcy Code and to restore property rights, insofar as is practicable, to the same positions as when the case was first filed, but without affecting the disposition of debts. *In re Tomlin,* 105 F.3d 933, 936–37 (4th Cir.1997); *In re Lawson,* 156 B.R. 43, 45 (9th Cir. BAP 1993). The phrase "[u]nless the court, for cause, orders otherwise" in Section 349(a) authorizes the bankruptcy court to dismiss the case with prejudice. See also *In re Tomlin,* 105 F.3d at 937; 3 Collier on Bankruptcy § 369.01, at 349–2–3 (15th ed.1997). A dismissal with prejudice bars further bankruptcy proceedings between the parties and is a complete adjudication of the issues. *Tomlin,* 105 F.3d at 936–937.

In applying the test for dismissal with prejudice, *Leavitt* directs the bankruptcy courts to a variety of factors to consider:

(1) whether the debtor "misrepresented facts in his [petition or] plan, unfairly manipulated the Bankruptcy Code, or otherwise [filed] his Chapter 13 [petition

or] plan in an inequitable manner," *Eisen v. Curry (In re Eisen)*, 14 F.3d 469, 470 (9th Cir.1994) (citing *In re Goeb*, 675 F.2d 1386, 1391 (9th Cir.1982));

(2) "the debtor's history of filings and dismissals," *Id.* (citing *In re Nash*, 765 F.2d 1410, 1415 (9th Cir.1985));

(3) whether "the debtor only intended to defeat state court litigation," *Id.* (citing *In re Chinichian*, 784 F.2d 1440, 1445–46 (9th Cir.1986)); and

(4) whether egregious behavior is present, *In re Tomlin*, 105 F.3d 933, 937 (4th Cir.1997); *In re Bradley*, 38 B.R. 425, 432 (Bankr.C.D.Cal.1984).

*Leavitt*, 171 F.3d at 1224.

In this case, Debtors have not filed, and then dismissed, their prior bankruptcy case. There is also no evidence of any pending state court litigation Debtors would interrupt by the Chapter 13 filing. However, of the four factors mentioned in *Leavitt*, the first and fourth are particularly salient in this instance.

 The absence of a statutory bar to the filing of Debtors' Chapter 13 petition does not render that strategy equitable or appropriate. With no effort on their part to disguise it, Debtors' second bankruptcy filing stands as a conspicuous attempt to unfairly manipulate the Bankruptcy Code in their favor. This very Court has found that, though prohibited from doing so by the Bankruptcy Code, Debtors engaged in conduct justifying revocation of their Chapter 7 bankruptcy discharge. Debtors concealed important facts about their financial affairs from the Chapter 7 trustee, attempted to prevent assets of the bankruptcy estate from being liquidated, and attempted to cover up their activities. The Court's findings and conclusions in the adversary proceeding stand as fact and law that Debtors knowingly and fraudulently violated the duties imposed upon them by federal law, the Bankruptcy Code.

At the motion hearing, Debtors' counsel insisted the Court's decision in the Chapter 7 case was wrong, but that for ostensibly good reasons (that carry little weight here) Debtors took no appeal of that decision. Instead, Debtors chose to collaterally attack the Court's judgment under the auspices of their Chapter 13 filing. They should not be allowed to do so.

 Utilization of Chapter 13 to successfully circumvent the penalty imposed upon Debtors for their inappropriate conduct in a prior bankruptcy case is not just irony. It would instead portray the law as nonsense. "The Court must preserve the integrity of the bankruptcy process by refusing to condone its abuse." *In re Steeley*, 243 B.R. 421 (Bankr. N.D.Ala.1999). Bankruptcy in general, and certainly Chapter 13 in particular, are designed to offer relief to the consumer debtor against the stresses of legitimate financial failure. Debtors brought their predicament upon themselves. But for their misconduct, their Chapter 7 discharge would have launched their fresh start. Debtors cannot now, through manipulation of the Code, use the statutory protections of bankruptcy as a remedy to avoid the consequences of being disqualified for the precise relief they seek.

Debtors instead compound their illegal activities in the prior case by engaging in bad faith here. Their proposed Chapter 13 plan makes no effort to remedy their wrongs. Creditors will only receive token monthly payments over the minimum term allowed by law. Debtors intend to discharge Mr. Krommenhoek's money judgment, along with all of the other debts the Court has declared should not be discharged. Debtors' duty to turn over assets to the Chapter 7 trustee is not even mentioned in their plan. To allow Debtors Chapter 13 relief under these circumstances would be, at least, inequitable.

*Leavitt* also instructs the Court to focus upon whether Debtors' behavior is egregious. The term egregious in not defined in the Code, but is generally understood to include behavior that is "remarkably bad"

or "flagrant," Black's Law Dictionary 534 (7th ed.1999). "Flagrant" acts in this setting would include those that are "so obviously inconsistent with what is right or proper as to appear to be a flouting of law or morality." Webster's Ninth New Collegiate Dictionary 468 (1990).

It should be clear Debtors' conduct in connection with their Chapter 7 case was indeed egregious. A central purpose of the Bankruptcy Code is to provide a fresh start to the honest but unfortunate debtor. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). But another goal of the Code identified by the courts "is to protect certain classes of creditors whom a debtor has harmed by egregious conduct." *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 793 (9th Cir.1997). This policy is evident in the express language of Section 727(d)(2), which allows for the revocation of discharge when a debtor knowingly and fraudulently conceals property of the bankruptcy estate. Thus, concealing of relevant information about a debtors' financial affairs has been found to constitute egregious conduct. *Colonial Auto Center v. Tomlin (In re Tomlin)*, 105 F.3d 933, 937 (4th Cir.1997).

Revocation of discharge is an extraordinary remedy. *Bowman v. Belt Valley Bank (In re Bowman)*, 173 B.R. 922, 924 (9th Cir. BAP 1994). It is, in a real sense, the supreme penalty for bad conduct in bankruptcy. The debtor suffers the inconvenience, expense and even ignominy associated with the seeking bankruptcy relief, together with the loss of any assets of value to liquidation by the trustee. However, the dishonest debtor is also denied the essential relief of bankruptcy: a discharge of unpaid indebtedness. Revocation or denial of discharge is a penalty is not lightly invoked by the Court. It is at least in part intended by Congress and the courts to deter inappropriate conduct by others who may contemplate betraying their creditors in bankruptcy.

Considered in this vein, Debtors' use of Chapter 13 is repugnant to the legitimate policies and goals of America's bankruptcy laws and flouts the intent of Congress. For the Court to hold otherwise would seriously endanger the punitive and remedial purposes that denial or revocation of a discharge under Section 727 now represents.

More than adequate grounds exist to grant Trustee's Motion to Dismiss this Chapter 13 case for "cause" under Section 1307(c)(1). Such a result is not enough under these facts. To drive home the significance of the Court's concern for this turn of events, and given the aggravated circumstances present here, pursuant to the authority granted the Court by Section 349(a) as interpreted by appellate courts, the additional remedy of dismissal with prejudice is appropriate here.

**Conclusion**

Considering the totality of the circumstances, and especially the facts and law announced by the Court in its prior decision, the Court concludes Debtors have filed this Chapter 13 case in bad faith. Debtors are attempting to improperly manipulate the provisions of the Bankruptcy Code, and Debtors have engaged in egregious behavior. Good cause is shown to dismiss the case. However, mere dismissal, with the attending ability to file for bankruptcy relief yet again, does not sufficiently protect creditors from abuse under these aggravated circumstances.

For these reasons, Trustee's Motion to Dismiss will be granted. Debtors' Chapter 13 case will be dismissed with prejudice. A separate order will be entered by the Court.